**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Dyshawn Pierre,**

*Plaintiff,*

**v.**                                                           **Case No. 3:15-cv-362**
                                                                **Judge Thomas M. Rose**

**University of Dayton,**

*Defendant.*

---

## ENTRY AND ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER. (DOC. 2).

---

Pending before the Court is Plaintiff's Motion for Restraining Order. (Doc. 2.) Therein, Plaintiff Dyshawn Pierre asks the Court to forbid Defendant the University of Dayton from enforcing its imposition of a one-semester suspension. (*Id.*) Plaintiff's Complaint charges Defendant with breach of contract in failing to adhere to provisions of its student handbook; negligence in breaching a duty to provide a fundamentally fair hearing; violation of the Rehabilitation Act, 29 U.S.C. § 794(a) by failing to accommodate Pierre's disability; violation of the Americans with Disabilities Act, 42 U.S.C. § 12182; violation of Title IX, 20 U.S.C. §§ 1681(a), 1687, by denying a fundamentally fair hearing, which resulted in an erroneous outcome, and violation of Title IX by acting with deliberate indifference to procedures and policies that effectively denied Pierre's right to a fair hearing. (Doc. 1.) Plaintiff further seeks equitable

1

relief in the form of vacatur of the University Hearing Board ("UHB") decision on the bases of partiality and misconduct.  (*Id.*)

"In determining whether to issue a temporary restraining order, the Court should consider: '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.'" *Hunter v. Hamilton County Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011).

The first order of business, then, is to consider whether the movant has a strong likelihood of success on the merits of each claim.  To do so requires a brief description of the facts of the case.

On April 22 and 23, 2015, Pierre and a female were voluntarily in Pierre's bedroom.  The two had sexual intercourse.  The UHB ultimately determined that Pierre "was unable to demonstrate that he received any words or actions that indicated he had effective consent for sexual intercourse or sexual contact.  This was illustrated by his general indication that he interpreted her body language as consent but failed to give specific examples of what this body language entailed."  (Doc. 7-4, PageID# 387.)

The woman filed a complaint with the University on May 3, 2015.  On May 4, Pierre was notified that a report had been received by the University's Title IX/Equity Compliance Office and that the University would be investigating the report.  (Doc. 2-6.)  A copy of the report was attached to the May 4 correspondence.  (*Id.*)  The correspondence informed Pierre where to find a description of the procedures and protocols regarding the investigation; advised Pierre that he had a right not to participate in the investigation process; advised him that refusing to participate or

limiting his participation may limit the University's ability to discover facts he may believe are pertinent; advised him that he would not be able to submit information to the student conduct system unless he submitted it through the investigation; and informed him that the Title IX/Equity Compliance Office would be happy to answer any questions he had about the process.  (*Id*.)

On May 18, Pierre informed the University that because there was a criminal investigation pending, he had been advised by counsel to submit a written statement.  (Lori Shaw Declaration at ¶5.)  Pierre was advised that a written statement was acceptable and that it would be included in the case file.  (*Id*.)  Pierre was also reminded that he was permitted to provide a list of any potential witnesses as well as any physical or written evidence such as texts, emails, photos, medical reports that he wished to be considered by the investigatory team.  (*Id*.)  He was also advised that he could submit impact statements and/or letters of reference.  (*Id*.)  Pierre was asked to submit those materials by May 28.  (*Id*.)

Two professors in the University's School of Law were assigned as the Title IX investigators.  (*Id*. at ¶2.)  Both completed specialized training in undertaking Title IX investigations and been certified by the Association of Title IX Administrators.  (*Id*. at ¶3.)

On May 18, the investigators interviewed the Complainant.  (*Id*. at ¶6.)  She described her version of the events that took place on April 22-23 and drew a diagram of Pierre's room. (*Id*.)

On May 21, the investigators interviewed two witnesses identified by the Complainant as individuals with knowledge relevant to the evening in question.  (*Id*. at ¶7.)  On May 28, the investigators interviewed Pierre's roommate.  (*Id*. at ¶8.)

On May 28, the investigators received Pierre's written statement, text messages between him and the Complainant on April 23, an impact statement, and two character reference letters.

(*Id.*)  On June 4, the investigators performed a follow-up interview with the Complainant.  (*Id.* at ¶10.)  The Complainant also submitted an impact statement.  (*Id.*)  At the Complainant's request, the Student Health Center sent a copy of her medical report.  (*Id.*)

The investigators also sent a request for an interview to a male friend of both the Complainant and Pierre, but that male friend never responded to the request.  (*Id.* at ¶11.)  Before finalizing an interview summary, the investigators sent a copy to the interviewee for him or her to review for accuracy.  (*Id.* at ¶12.)

The investigators emailed Mary Buchwalder, M.D. (Medical Director of the University's Student Health Center) regarding medical terminology in the Complainant's medical report.  They received written statements from two witnesses that were provided to the University of Dayton police, and text messages from those two witnesses that were also provided to the University of Dayton police.  (*Id.* at ¶13.)

On June 18, Pierre was given the opportunity to submit any additional information by June 22.  (*Id.*)  On June 19, the investigators completed their Title IX report.  (*Id.* at ¶15.)  Based on their investigation, they recommended the matter be referred to the Office of Community Standards and Civility ("OCSC") for an Accountability Hearing to determine if Pierre was responsible for violating the sexual harassment section of the Code of Conduct.  (*Id.*)  That recommendation was accepted and the matter was referred for an Accountability Hearing.  (*Id.*)

On June 17, Pierre submitted "Objections to Process" and a "Request for Discovery" to William Fischer, the University's Vice President for Student Development.  (Ex. 3 – William Fischer Declaration, at ¶2, Ex. A.)  Pierre also requested that the University "abandon the current procedures and terminate all proceedings against me."  (*Id.*)  Fischer responded, explaining that the University would not "abandon the process and terminate the proceedings;" and reminding him

4

that the University "is not a court of law" and the process does "not contemplate discovery like that in a court proceeding" or a "voir dire process." (*Id*. at ¶3, Ex. B.)

On July 1, the OCSC sent Pierre a letter attaching a redacted copy of the Title IX investigators' report and notifying him that a Behavioral Hearing was set for July 9 at 1:30 p.m. (Ex. 4 – Debra Monk Declaration at ¶3.) He was notified that the Behavioral Hearing is a chance to review a copy of the report and discuss preparation for the hearing. (*Id*.) On August 12 and 19, Pierre sent letters to Fischer and David Sipusic, the University's Title IX Coordinator and Equity Compliance Officer, making various objections to the Title IX report. (Fischer Decl. at ¶4, Exs. C, D.) Sipusic responded, acknowledging receipt of the letter and advising Pierre that the report was prepared consistent with the University's procedures and the University's obligations under federal law. (*Id*.)

The Accountability Hearing was held on August 20. (Monk Decl. at ¶4.) There were two undergraduate students, one graduate student, one faculty member, and one University staff member on the UHB. (*Id*.) Debra Monk, the University's Director of Community Standards and Civility and Associate Dean of Students, served as the UHB chair. (*Id*. at ¶2.)

Pierre was present with his attorney, Merlyn Shiverdecker. (*Id*. at ¶6.) Complainant was also present, but with a non-attorney advisor. (*Id*.) The advisors were reminded that they are not permitted to orally participate, but they are permitted to advise and author notes to their respective parties during the hearing. (*Id*.) Next, Monk asked Pierre if he had read and if he understood the alleged violation. (*Id*. at ¶7.) Pierre answered in the affirmative. (*Id*.) Monk then asked Pierre for his response to the alleged violation and, after some confusion, he stated that he was not responsible. (*Id*.)

The Title IX investigators summarized their investigatory report and outlined the facts that were undisputed and the facts that were in conflict. (*Id*. at ¶8.) After this, the UHB members were permitted to ask any questions of the investigators. (*Id*.) The UHB asked a number of questions of the investigators. (*Id*.) After the UHB concluded its questions for the investigators, both the Complainant and Pierre were permitted to make introductory remarks. (*Id*. at ¶9.) The Complainant made introductory remarks. (*Id*.) Pierre declined to make any introductory remarks, but referred the UHB to a prepared, written statement that had been distributed to the UHB members before the hearing. (*Id*.)

Three witnesses were present to testify at the hearing: two identified by the Complainant and one identified by Pierre. (*Id*. at ¶10.) The UHB, the Complainant, and Pierre were all asked whether they had questions for the Complainant's first witness. (*Id*.) No party answered affirmatively and no testimony was taken from Complainant's first witness. (*Id*.) The same was asked for the Complainant's second witness. (*Id*.) Again, no party answered affirmatively and no testimony was taken from Complainant's second witness. (*Id*.) The same was asked for Pierre's witness. (*Id*.) Once again, no party answered affirmatively and no testimony was taken from Pierre's witness. (*Id*.) Monk advised that each witness would be retained in case either party or the UHB had questions for any witness that they wanted to ask before the hearing concluded. (*Id*.)

As will be discussed, the University procedures did not allow the parties to directly question the witnesses. They were free to submit written questions to the UHB, which would ask them if they were deemed appropriate. Pierre's counsel had been told that he was permitted to author notes to Pierre during the hearing. Pierre's counsel chose not to write any questions for Pierre to pass on to the UHB.

Thereafter, the UHB was permitted to ask questions of Pierre and the Complainant.   (*Id*. at ¶11.)   The UHB asked two questions of Pierre.   (*Id*.)   The Complainant did not submit any questions to be asked of Pierre.   (*Id*.)   The UHB then asked four questions of the Complainant. (Id.) Pierre did not submit any questions to be asked of the Complainant.   (*Id*.)   Monk then once again asked all parties whether they had any questions for the witnesses that were present.   (*Id*.) All parties again declined to ask questions of any witness.   (*Id*.)

Monk then offered both the Complainant and Pierre time to think of any additional questions to submit to be asked of the other party.   (*Id*. at ¶12.)   Both parties again declined the opportunity to ask questions of each other.   (*Id*.)   The UHB was also given the opportunity to ask any other questions of either party or of the investigators.   (*Id*.)   No additional questions were asked.   (*Id*.)

To conclude the hearing, both parties were given the opportunity to make closing remarks. (*Id*. at ¶13.)   The Complainant made her closing remarks.   (*Id*.)   Pierre then made his closing remarks, which consisted of a ten-page typed-written statement that was both distributed to the UHB and read by Pierre.   (*Id*. at ¶13, Ex. A.)   The entire UHB hearing took approximately 51 minutes.   (*Id*. at ¶13.)   Pierre's closing remarks took approximately 20.5 minutes.   (*Id*.)

The next day, August 20, 2015, Monk notified Pierre and the Complainant that the UHB had found Pierre responsible for violating the sexual harassment section of the Code of Conduct. (*Id*. at ¶14.)   That notification also advised the parties that the UHB had issued a suspension to Pierre until December 20.   (*Id*.)   Pierre was notified to submit an appeal by August 26 at 4:30 p.m. if he wished to do so.   (*Id*. at ¶14, Ex. B.)

On August 26, Pierre submitted an appeal.   (*Id*. at ¶15, Ex. C.)   For the first time during this process, Pierre alleged that he has a disability that hinders his ability to articulate and express

7

himself verbally while under stress and pressure and the University should have allowed him "meaningful representation." (*Id*.) On August 31, Monk notified Pierre that the Associate Vice President for Student Development and Dean of Students had reviewed his request for an appeal and forwarded his case to the Judicial Review Committee ("JRC") for a full appellate review. (*Id*.)

On September 4, the JRC reviewed Pierre's appeal. (*Id*. at ¶16.) On September 9, Monk informed Pierre that the JRC determined the UHB's decision would stand. (*Id*. at Ex. C.) Monk notified Pierre that the JRC's decision was final and he must vacate University housing by September 11. (*Id*.) Four weeks later, on October 7, 2015, Pierre filed the complaint and motion for temporary restraining order in the instant case.

The Court will first address Pierre's claim that the University failed to accommodate Pierre's disability, depriving Pierre of a fair investigation and hearing. Initially, the Court notes "[i]nstitutions [of postsecondary education] do not have a duty to identify students with disabilities. Students in institutions of postsecondary education are responsible for notifying institution staff of their disability should they need academic adjustments." U.S. Dept. of Education Office for Civil Rights, Transition of Students With Disabilities To Postsecondary Education: A Guide for High School Educators, http://www2.ed.gov/about/offices/list/ocr/transitionguide.html#note16 (last visited, October 7, 2015).

In addition to the law requiring Pierre to request an accommodation before any University obligation is triggered, Pierre was notified of his responsibility when he began at the University. (Arbuckle Decl. at ¶2, Ex. A.); *see also Blower v. Univ. of Washington*, No. C10-1506MJP, 2010WL 3894096, at *2 (W.D. Wash. Sept. 27, 2010) ("[T]he weight of the authority places the burden on her to request an accommodation before any duty is triggered.") (citing cases).

Pierre cannot succeed on his failure to accommodate claim because he never requested an accommodation during his disciplinary process until it was over and he appealed. *See Carlson v. Carroll Univ.*, No. 09-C-551, 2011WL 5921445, at *14 (E.D. Wis. Nov. 28, 2011) (dismissing plaintiff's claim for failure to accommodate because "Carlson cited no record evidence showing that she made this request to anyone"); *Buescher v. Baldwin Wallace Univ.*, 86 F. Supp. 3d 789, 806 (N.D. Ohio 2015) ("[S]he did not request an accommodation for her disability and there can be no failure to accommodate.").

While Pierre contends that the fact that he informed the University's Office of Learning Resources department that he had a disability triggers an obligation on every department of the University to offer him accommodations when dealing with him, this is legally incorrect. *See Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 465 (4th Cir. 2012) (affirming dismissal of a former student's ADA claim where he had only previously requested testing accommodations from the university and did not make any other accommodation request until he submitted a letter appealing his dismissal from the university). Other departments in the University would not know to ask Pierre about accommodations because University policy dictates that Pierre's disability and accommodations are confidential. *See* https://www.udayton.edu/ltc/_resources/learningresources/documents/ds_handbook.pdf, at p. 10. (last visited, October 12, 2015).

In his appeal, nearly four months after he was first notified of the disciplinary process, Pierre alleged that because he has a disability, he does not have the ability to articulate and express himself verbally while under stress and pressure and the University should have allowed him "meaningful representation." (Monk Decl. at ¶15, Ex. C.) However, "the majority of federal

courts agree that an after-the-fact accommodation request is not timely." *Shaikh v. Lincoln Mem'l Univ.*, 46 F. Supp. 3d 775, 786 (E.D. Tenn. 2014) aff'd, 608 F. App'x 349 (6th Cir. 2015).

Moreover, the University allowed Pierre to have legal representation accompany him throughout the process. (Doc. 2-5 at PageID# 214.) Pierre chose to submit a written statement instead of being interviewed. (Shaw Decl. at ¶5.) Pierre declined to submit questions during his hearing, despite the fact that his attorney could have written the questions for him. (Monk Decl. at ¶¶10-12.) And Pierre was permitted to distribute and read a ten-page written statement at his hearing. (*Id.* at ¶13.) Even if Pierre had requested an accommodation, the University largely accommodated Pierre's inability to articulate and express himself throughout the process.

Given Pierre's failure to request accommodation and the fact that his needs were largely accommodated, it is not likely that Pierre will succeed on his disability claims.

As stated in his complaint, Pierre's other claims – for breach of contract in failing to adhere to provisions of its student handbook, negligence in breaching a duty to provide a fundamentally fair hearing, violation of Title IX, 20 U.S.C. §§ 1681(a), 1687, by denying a fundamentally fair hearing, which resulted in an erroneous outcome, and violation of Title IX by acting with deliberate indifference to procedures and policies that effectively denied Pierre's right to a fair hearing – all hinge upon whether the hearing afforded Pierre by the University was fundamentally fair.

The Student Discipline Process at the University of Dayton is governed by the Student Conduct System outlined in the Student Handbook. (Doc. 2-3 at PageID# 115.) As the University asserts its primary responsibility is the education of its students, the purpose of the Student Conduct System and the Code of Conduct is to maintain a campus environment that is

conducive to learning, protects the University's educational mission, maintains reasonable order, protects the community, and assists in the character development of each student. (*Id.*)

The University's Code of Conduct prohibits sexual harassment. (*Id.* at PageID# 119, 142.) It describes sexual harassment to include non-consensual sexual contact, non-consensual sexual intercourse, forcible sexual intercourse, sexual violence, and sexual misconduct. (*Id.*) The University interpreted this to mean that Pierre had to have received express consent for every sexual action taken with regard to Complainant.

Students can make complaints of sexual harassment by submitting an electronic complaint form available on the University's Nondiscrimination Resource Center website. (*Id.* at PageID# 146.) Pursuant to Title IX statutes and regulations, the University maintains a Title IX office that is charged with investigating all complaints of violations of the Sexual Harassment policy. (*Id.*) Within three business days of receiving a complaint, an initial review is completed to determine if the complaint on its face alleges a code of conduct violation, and, if so, what violations will be alleged in a formal complaint. (Doc. 2-5 at PageID# 214.) If a violation is alleged, the complainant and respondent will be notified in writing as to the next steps of the process. (*Id.*)

The formal complaint resolution procedure consists of an investigation and a disposition/resolution. (*Id.* at PageID# 216.) The investigation and resolution process is completed as promptly as possible and the University strives to complete the process within 60 days. (*Id.* at PageID# 215.) In cases involving a student accused of a violation, the investigatory team, appointed by the Equity Compliance Officer, is tasked with two functions: (1) creating a case file to be used by the Hearing Board; and (2) determining whether, in light of the investigation, probable cause exists to believe a policy was violated. (*Id.* at PageID# 216-17.)

Prior to or at the beginning of the investigation, the respondent is provided a written copy of the complaint or otherwise informed of the substance of the allegations.  (*Id*. at PageID# 217.) The investigators are to interview the parties, interview other witnesses, and review appropriate documentation.  (*Id*.)  Complainants and respondents may refuse to participate in the investigation and may submit a written statement in lieu of an interview.  (*Id*. at PageID# 217-18.) However, students must present information to the investigators in order to thereafter be permitted to submit that information in an Accountability Hearing before a University Hearing Board ("UHB").  (*Id*. at PageID# 216.)  As the University advises, any decision to not participate or to otherwise limit participation may impact the University's ability to discover facts that a party believes are pertinent.  (*Id*. at PageID# 218.)

Complainants and respondents are permitted to bring a representative, including an attorney, to any interview with an investigator.  (*Id*.)  The representative may act in an advisory role, but is not permitted to actively participate.  (*Id*.)  The complainant and respondent are asked to provide a list of possible witnesses as well as any written or physical evidence they wish to be considered.  (*Id*.)

Upon conclusion of the investigation, the investigatory team prepares a written report. (*Id*.)  The report includes a statement of the allegations and issues, a description of the applicable standards, and a summary of the information considered.  (*Id*.)  In cases involving a student respondent, the report also includes a description of the contested and uncontested facts and a finding as to whether, in viewing the facts in a light most favorable to the complainant, probable cause exists to believe that a violation occurred.  (*Id*.)  If probable cause is found, the matter is referred to the Office of Community Standards and Civility ("OCSC") for an Accountability Hearing.  (*Id*. at PageID# 219.)  Before the hearing, the respondent is invited to a Behavioral

Hearing with a member of the OCSC where the respondent is permitted to review the investigatory report and ask questions about the process.   (Doc. 2-3 at PageID# 124, 154.)

At the hearing, the UHB is provided a copy of the investigatory report.  (*Id*. at PageID# 154.)   The UHB is comprised of three to five members, with a majority of students comprising the quorum.  (*Id*.)   The hearing is facilitated by a UHB chair, but that individual does not vote on responsibility or consequences.  (*Id*.)   Complainants and respondents are permitted to request a list of the UHB members and may submit concerns about possible conflicts of interest or bias to the OCSC.  (*Id*. at PageID# 156.)

At the hearing, the investigatory team is to present its report and answer questions about the report.  (*Id*. at PageID# 155.)   The UHB then asks questions to the complainant, respondent, and any witnesses.  (*Id*.)   Next, the complainant and respondent are permitted to ask questions of each other and the witnesses, but those questions must be first submitted to the UHB.  (*Id*.)   The UHB will determine, based on relevance and their need for additional information to make a determination, whether the submitted questions will be approved.  (*Id*.)   To conclude the hearing, the parties are permitted to make closing remarks.  (*Id*. at PageID# 157.)

After the hearing, the UHB makes a determination by a majority vote using a preponderance of the evidence standard.  (*Id*. at PageID# 154.)   The University defines preponderance of the evidence as requiring the UHB to determine whether the facts the complainant has alleged "more likely than not" occurred.  (*Id*. at PageID# 182.)

After the determination is rendered, both the complainant and respondent are permitted to submit an appeal.  (*Id*. at PageID# 156.)   Grounds for appeal include (1) clear error in the student conduct procedure that may have affected the final outcome of the board's decision and (2) new evidence or new information that did not exist at the time of the hearing that may affect the board's

findings.  (*Id*.)  If the appeal is based on proper grounds, it will be reviewed by the Judicial Review Committee ("JRC").  (*Id*.)  The JRC may affirm the board's findings; order that the board be reconvened to consider new evidence; order that a new board be convened or that the student conduct process start back at an earlier point; or reverse the board's findings.  (*Id*.)

While the University's sexual harassment resolution policies may not be ideal, the courts "will not interfere with a private university's right to make regulations, establish requirements, set scholastic standards, and enforce disciplinary rules absent a clear abuse of discretion."  *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011) (quoting *Ray v. Wilmington Coll*., 667 N.E.2d 39, 42 (Ohio App. 1995)) (citations and internal quotations omitted); *see also Schoppelrei v. Franklin Univ*., 11 Ohio App. 2d 60, 62 (Ohio Ct. App. 1967) (a university has a "broad range of discretion" and a plaintiff must show a "lack of evenhanded justice in the administration of the university regulations amounting to an abuse of discretion").

"The issue here is not whether [the University] could have provided [Pierre] with a better hearing or whether the hearing satisfied the requirements of a formal trial."  *Ray*, 667 N.E.2d at 42 (citation omitted).  "Instead, the issue is whether the judicial board abused its discretion."  *Id*. Similarly, the issue before this Court is not whether the UHB should have believed a certain party's version of the events. Rather, the issue is whether the University abused its discretion (*i.e.* acted arbitrarily).  *See McDade v. Cleveland State Univ.*, No. 14AP-275, 2014WL 4557015, at *4 (Ohio App. Sept. 16, 2014).

The proper focus in analyzing whether a private university provided fundamental fairness is whether the University adhered to its misconduct procedure.  *Doe v. Amherst College*, 3:15-cv-30097, Doc. 38 at 23 (D. Mass. Oct. 5, 2015).  The question is whether the proceedings fell within the range of reasonable expectations of one reading the relevant rules, an objective

reasonableness standard.   *Id.* at 19 (citing *Walker v. President & Fellows of Harvard Coll.*, 82 F. Supp. 3d 524, 530 (D. Mass. 2014).   "[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." *Id.* (quoting *Shauer v. Brandeis University*, 432 Mass. 474, 482 (2000).   Here, the University of Dayton did comply with its own policies.

At oral argument, Pierre challenged the qualifications of the UHB.   The two law professors were trained Title IX investigators.   Pierre decries that there was no majority of students on the UHB as one of the "students" was a graduate student.   Graduate students are students, and the presence of one allows for fairness when the accused is a graduate student. Pierre also decries that the process took more than the 60 days exhorted in the Handbook.   The University explained that the UHB's pace was laudable in light of the fact that the process occurred during the summer session.   This explanation is not unreasonable.   Pierre's position is not aided in this regard by allowing nearly a month to elapse before filing the instant case.

In addition to reviewing compliance with provisions of student handbooks, courts consider whether the disciplinary process afforded by a private college was conducted with "notions of basic fairness."   *Doe v. Amherst*, at 32.   Here, the disciplinary process was fundamentally fair. *Id.* (analyzing a very similar policy).

Finally, Pierre spends considerable time decrying that he was "forc[ed] to defend himself at the Hearing."   (Doc. 2-2, at 17 PageID# 77.)   Pierre's attorney inexplicably declined to pass any written questions to Pierre for Pierre to hand on to the panel.   *Cf. Doe v. Regents of the Univ. of Calif. San Diego*, 37-2015-10549 (San Diego County Sup. Ct. July 10, 2015)("only nine of Petitioner's thirty-two questions were actually asked by the Panel Chair.").

15

In sum, based on the record now before the Court, Pierre has not demonstrated that he has a strong likelihood of success on the merits of his claims because he failed to ask for accommodation and because the process promised him and provided to him was fundamentally fair.

As for the remaining factors to be considered, Pierre has not shown that refusal to issue an injunction would cause him to suffer irreparable injury.   Pierre had been suspended from school one month before filing suit.   The significance of his delay in seeking an injunction is even greater because his suspension only lasts until the end of this semester.   "Plaintiff's delay in seeking a preliminary injunction undermines [his] allegation of irreparable harm."  *Wells Fargo v. When U.com*, Inc., 293 F.Supp.2d 734, 772–72 (E.D. Mich. 2003).   "A delay between the discovery of the allegedly infringing conduct and the request for injunctive relief can support an inference that the alleged harm is not sufficiently severe or irreparable to justify injunctive relief."  *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 867 (S.D. Ohio 2008).

Moreover, courts have also held that a suspension from school is not irreparable.  *Medlock v. Trs. of Ind. Univ.*, No. 1:11-CV-00977-TWP, 2011WL 4068453, at *9 (S.D. Ind. Sept. 13, 2011) (finding no irreparable harm because the plaintiff would be eligible for reinstatement when his suspension ended, he would have the opportunity to re-take any classes he failed as a result of his suspension, and the record of his suspension was protected by the Family Educational Rights and Privacy Act).   After his suspension ends, Pierre will be permitted to petition for re-enrollment to the University.   Therefore, the Court finds that the second factor, irreparable injury, weighs in favor of denying injunctive relief.

The third factor is whether the issuance of a temporary restraining order would cause substantial harm to others.   The Complainant involved in this disciplinary matter "can rightfully expect to pursue her education in an environment free from the harassing behavior of a fellow

16

student." *Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015). This expectation can be met, however, even if the Court were to enter a restraining order permitting Pierre to attend classes on campus. As a result, this factor alone does not necessarily preclude the issuance of a restraining order.

Finally, as to whether the public interest would be served by the issuance of the temporary restraining order, the Court notes that the public has an interest in assuring that private institutions comport with general notions of procedural fair play. On the other hand, there is also a public interest in providing an educational environment that is free from harassment. Colleges and universities are afforded great latitude in administering their rules and regulations as courts recognize that those institutions' primary responsibility is to provide an atmosphere conducive to study and learning for all students. *See Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 865 (3d Cir. 1984) ("There can be no doubt that a public university has a significant interest in carrying out its educational mission"). The Court concludes that the fourth factor, the public interest, weighs in favor of denying injunctive relief. *Cf. Ben-Yonatan v. Concordia Coll. Corp.,* 863 F. Supp. 983, 988 (D. Minn. 1994).

Because Plaintiff is not likely to succeed on the merits of his claim, and because his alleged harm is not irreparable, and because the public interest is served by allowing universities to carry out their disciplinary rules and procedures, Plaintiff's Motion for Temporary Restraining Order (Doc. 2) is **DENIED**.

October 19, 2015

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

17