UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**Dyshawn Pierre,**

*Plaintiff,*

**v.**                                                    **Case No. 3:15-cv-362**
                                                         **Judge Thomas M. Rose**

**University of Dayton,**

*Defendant.*

---

**ENTRY AND ORDER GRANTING MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM,** (DOC. 13)**, AND TERMINATING CASE.**

---

Pending before the Court is Defendant University of Dayton's Motion to Dismiss Plaintiff Dyshawn Pierre's Complaint for Failure to State a Claim. Doc. 13.  The Complaint charges Defendant with eight claims: Count I alleges that the University of Dayton breached a contract between the parties by failing to adhere to its Student Handbook; Count II alleges that the University acted negligently in disciplining Pierre; Counts III and IV assert that the University violated the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*., and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*., by failing to accommodate Plaintiff's disability during his disciplinary process; Count V asserts a Title IX, 20 U.S.C. § 1681(a), claim under an erroneous outcome theory, while Count VI purports to assert a claim for deliberate

1

indifference in violation of Title IX; Counts VII and VIII allege claims under the Ohio Arbitration Act, Ohio Rev. Code § 2711.01, et seq. (Doc. 1).

**Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the adequacy of the pleadings, so a court generally may not consider materials beyond the contested pleading itself in ruling on the motion. See *Winget v. J.P. Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). However, a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); see also *Bd. of Trustees Sabis Int'l Sch. v. Montgomery*, 205 F. Supp. 2d 835, 843 (S.D. Ohio 2002) ("[A] court may rely on documents outside the pleadings, if those documents 'simply [fill] in the contours and details of the plaintiff's complaint, and [add] nothing new,' without converting the motion to dismiss into a motion for summary judgment.") (quoting *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997)).

**Background**

Plaintiff Dyshawn Pierre was a student attending Defendant, the University of Dayton. The night of April 22 to 23, 2015, Pierre and a female student were voluntarily in Pierre's bedroom. Indeed, voluntarily in Pierre's bed. The two were willingly unclothed in Pierre's bed. The two had intercourse. The scene was not new to them; that they had intercourse was.

A University Hearing Board ultimately determined that Pierre "was unable to demonstrate that he received any words or actions that indicated he had effective consent for sexual intercourse or sexual contact. This was illustrated by his general indication that he interpreted [the female's]

2

body language as consent but failed to give specific examples of what this body language entailed." (PageID 387).

According to the University Handbook:

> Whether sexual misconduct has occurred depends in part on whether "effective consent" exists. Effective consent is granted "when a person freely, actively, and knowingly agrees at the time to participate in a particular sexual act with a particular person. Effective consent exists when mutually understandable words and/or actions demonstrate a willingness to participate in mutually-agreed-upon activity at every stage of that sexual activity. Effective consent has time boundaries. Consent at one time does not imply consent at another time. The existence of a dating/romantic relationship between the persons involved or the fact of a previous sexual relationship does not automatically establish effective consent for future sexual activity. There is no consent "when agreement is only inferred from a person's silence or lack of resistance…"

(PageID 144).

Ten days later, on May 3, 2015, the woman filed a complaint with the University. On May 4, Pierre was notified that a report had been received by the University's Title IX Equity Compliance Office and that the University would be investigating the report. (PageID 227). A copy of the report was attached to the May 4 correspondence. (Id.). The correspondence informed Pierre where to find a description of the procedures and protocols regarding the investigation; advised Pierre that he had a right not to participate in the investigation process; advised him that refusing to participate or limiting his participation may limit the University's ability to discover facts he may believe are pertinent; advised him that he would not be able to submit information to the student conduct system unless he submitted it through the investigation; and informed him that the Title IX Equity Compliance Office would be happy to answer any questions he had about the process. (Id.).

On May 18, Pierre informed the University that because there was a criminal investigation pending, he had been advised by counsel to submit a written statement. (PageID 349). Pierre was informed that a written statement was acceptable and that it would be included in the case file. (Id.). Pierre was also reminded that he was permitted to provide a list of any potential witnesses as well as any physical or written evidence such as texts, emails, photos, medical reports that he wished to be considered by the investigatory team. (Id.). He was also advised that he could submit impact statements and/or letters of reference. (Id.). Pierre was asked to submit those materials by May 28. (Id.).

Two professors in the University's school of law were assigned as the Title IX investigators. (PageID 348). Both had completed specialized training in undertaking Title IX investigations and had been certified by the Association of Title IX Administrators. (Id.).

On May 18, the investigators interviewed the female Complainant. (Id. at ¶6). She described her version of the events that took place on April 22–23. (Id.).

On May 21, the investigators interviewed two witnesses identified by the Complainant as individuals with knowledge relevant to the evening in question. (Id. at ¶7). On May 28, the investigators interviewed Pierre's roommate. (Id. at ¶8).

On May 28, the investigators received Pierre's written statement, text messages exchanged between him and the Complainant on April 23, an impact statement and two character reference letters. (Id.). On June 4, the investigators performed a follow-up interview with the Complainant. (Id. at ¶10). The Complainant also submitted an impact statement. (Id.). At the Complainant's request, the Student Health Center sent a copy of her medical report. (Id.).

The investigators also sent a request for an interview to a male friend of both the Complainant and Pierre, but that male friend never responded to the request. (Id. at ¶11). Before

finalizing an interview summary, the investigators sent a copy to each interviewee for him or her to review for accuracy. (Id. at ¶12).

The investigators emailed Mary Buchwalder, M.D. (Medical Director of the University's Student Health Center) regarding medical terminology in the Complainant's medical report. They received written statements from two witnesses that were provided to the University of Dayton police and text messages from those two witnesses that were also provided to the University of Dayton police. (Id. at ¶13).

On June 18, Pierre was given the opportunity to submit any additional information by June 22. (Id.). On June 19, the investigators completed their Title IX report. (Id. at ¶15). Based on their investigation, they recommended the matter be referred to the University Office of Community Standards and Civility for what the Handbook describes as an Accountability Hearing to determine if Pierre was responsible for violating the sexual harassment section of the Code of Conduct. (Id.). That recommendation was accepted and the matter was referred for an Accountability Hearing. (Id.).

On June 17, Pierre submitted documents entitled "Objections to Process" and a "Request for Discovery" to William Fischer, the University's Vice President for Student Development. (PageID 354-62). Pierre also requested that the University "abandon the current procedures and terminate all proceedings against me." (Id.). Fischer responded, explaining that the University would not "abandon the process and terminate the proceedings;" and reminding him that the University "is not a court of law" and the process does "not contemplate discovery like that in a court proceeding" or a "voir dire process." (PageID 363).

On July 1, the Office of Community Standards and Civility sent Pierre a letter attaching a redacted copy of the Title IX investigators' report and notifying him that a Behavioral Hearing was

5

set for July 9 at 1:30 p.m. (PageID 371).   He was notified that the Behavioral Hearing is a chance to review a copy of the report and discuss preparation for the hearing. (Id.).   On August 12 and 19, Pierre sent letters to Fischer and David Sipusic, the University's Title IX Coordinator and Equity Compliance Officer, making various objections to the Title IX report. (PageID 365-70).   Sipusic responded, acknowledging receipt of the letter and advising Pierre that the report was prepared consistent with the University's procedures and the University's obligations under federal law. (Id.).

The Accountability Hearing was held on August 20. (PageID 371).   There were two undergraduate students, one graduate student, one faculty member and one University staff member on the University Hearing Board ("UHB"). (Id.).   Debra Monk, the University's Director of Community Standards and Civility and Associate Dean of Students, served as the UHB chair. (Id. at ¶2).

Pierre was present with his attorney, Merlyn Shiverdecker. (PageID 372 at ¶6). Complainant was also present, but with a non-attorney advisor. (Id.).   The advisors were reminded that they are not permitted to orally participate, but that they were permitted to advise and author notes to their respective parties during the hearing. (Id.).   Next, Monk asked Pierre if he had read and if he understood the alleged violation. (Id. at ¶7).   Pierre answered in the affirmative. (Id.).   Monk then asked Pierre for his response to the alleged violation and, after some confusion, he stated that he was not responsible. (Id.).

The Title IX investigators summarized their investigatory report and outlined the facts that were undisputed and the facts that were in conflict. (Id. at ¶8).   After this, the UHB members were permitted to ask any questions of the investigators. (Id.).   The UHB asked a number of questions of the investigators. (Id.).   After the UHB concluded its questions for the investigators, both the

Complainant and Pierre were permitted to make introductory remarks. (Id. at ¶9). The Complainant made introductory remarks. (Id.). Pierre declined to make any introductory remarks, but referred the UHB to a prepared, written statement that had been distributed to the UHB members before the hearing. (Id.).

Three witnesses were present to testify at the hearing: two identified by the Complainant and one identified by Pierre. (Id. at ¶10). The UHB, the Complainant and Pierre were all asked whether they had questions for the Complainant's first witness. (Id.). No party answered affirmatively and no testimony was taken from Complainant's first witness. (Id.). The same was asked for the Complainant's second witness. (Id.). Again, no party answered affirmatively and no testimony was taken from Complainant's second witness. (Id.). The same was asked for Pierre's witness. (Id.). Once again, no party answered affirmatively and no testimony was taken from Pierre's witness. (Id.). Monk advised that each witness would be retained in case either party or the UHB had questions for any witness that they wanted to ask before the hearing concluded. (Id.).

As will be discussed, the University procedures did not allow the parties to directly question the witnesses. They were free to submit written questions to the UHB, which would ask them if they were deemed appropriate. Pierre's counsel had been told that he was permitted to author notes to Pierre during the hearing. Pierre's counsel chose not to write any questions for Pierre to pass on to the UHB.

Thereafter, the UHB was permitted to ask questions of Pierre and the Complainant. (Id. at ¶11). The UHB asked two questions of Pierre. (Id.). The Complainant did not submit any questions to be asked of Pierre. (Id.). The UHB then asked four questions of the Complainant. (Id.). Pierre did not submit any questions to be asked of the Complainant. (Id.). Monk then once

again asked all parties whether they had any questions for the witnesses that were present. (Id.). All parties again declined to ask questions of any witness. (Id.).

Monk then offered both the Complainant and Pierre time to think of any additional questions to submit to be asked of the other party. (Id. at ¶12). Both parties again declined the opportunity to ask questions of each other. (Id.). The UHB was also given the opportunity to ask any other questions of either party or of the investigators. (Id.). No additional questions were asked. (Id.).

To conclude the hearing, both parties were given the opportunity to make closing remarks. (Id. at ¶13). The Complainant made her closing remarks. (Id.). Pierre then made his closing remarks, which consisted of a ten-page typed-written statement that was both distributed to the UHB and read by Pierre. (Id. at ¶13, Ex. A). The entire UHB hearing took approximately 51 minutes. (Id. at ¶13). Pierre's closing remarks took approximately 20.5 minutes. (Id.).

The next day, August 20, 2015, Monk notified Pierre and the Complainant that the UHB had found Pierre responsible for violating the sexual harassment section of the Code of Conduct. (Id. at ¶14). That notification also advised the parties that the UHB had issued a suspension to Pierre until December 20. (Id.). Pierre was notified to submit an appeal by August 26 at 4:30 p.m. if he wished to do so. (Id. at ¶14, Ex. B).

On August 26, Pierre submitted an appeal. (Id. at ¶15, Ex. C). For the first time during this process, Pierre alleged that he has a disability that hinders his ability to articulate and express himself verbally while under stress and pressure and the University should have allowed him "meaningful representation." (Id.). On August 31, Monk notified Pierre that the Associate Vice President for Student Development and Dean of Students had reviewed his request for an appeal and forwarded his case to the Judicial Review Committee for a full appellate review. (Id.).

8

On September 4, the Judicial Review Committee reviewed Pierre's appeal. (Id. at ¶16). On September 9, Monk informed Pierre that the Judicial Review Committee determined the UHB's decision would stand. (Id. at Ex. C). Monk notified Pierre that the Judicial Review Committee's decision was final and he must vacate University housing by September 11. (Id.). Four weeks later, on October 7, 2015, Pierre filed a complaint (Doc. 1) in this Court which the University now requests the Court to dismiss. (Doc. 13).

**Analysis**

The University seeks to dismiss all claims in Plaintiff's complaint. The Court will consider each claim seriatim.

**Count I — Breach of Contract Claim**

Pierre asserts that the University breached a bevy of purported contractual obligations including failing to adhere to a contractual obligation regarding timeliness, failing to adhere to a contractual obligation regarding fulfillment of administrative responsibilities, failing to adhere to a contractual obligation regarding notice and failing to adhere to a contractual obligation regarding treating the parties equally. Plaintiff also claims that the University breached a contractual responsibility to accommodate a disability. Plaintiff also claims violation of a contractual duty of fair dealing and good faith by an alleged lack of due process and allegedly improper burden shifting. Plaintiff then, under the umbrella of an allegation of bias and impartiality, criticizes the report's result.

A breach of contract claim under Ohio law has four elements: (1) the existence of a contract; (2) the plaintiff's performance; (3) the defendant's breach; and (4) the existence of damages. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006). The University Handbook guarantees that "[t]he Student Conduct System at the University of Dayton […]

9

provides fundamental fairness for all parties" (PageID 115) and that the process will be "fair and reliable" (PageID 153, ¶ 17).

Pierre alleges the University, without notice to Pierre, "redefined" the Complainant's charges of "sexual assault" or "rape" as "sexual harassment."  However, the University Handbook that Pierre alleges was violated describes sexual assault and behavior constituting rape as instances of "sexual harassment," which it forbids. (PageID 141–42).

As further regards notice, on May 4, Pierre was notified that a report had been received by the University's Title IX Equity Compliance Office concerning "incidents which may involve sexual discrimination, including sexual harassment and sexual violence" and that the University would be investigating the report. (PageID 227).   A copy of the report was attached to the May 4 correspondence. (Id.).   The correspondence informed Pierre where to find a description of the procedures and protocols regarding the investigation; advised Pierre that he had a right not to participate in the investigation process; advised him that refusing to participate or limiting his participation may limit the University's ability to discover facts he may believe are pertinent; advised him that he would not be able to submit information to the student conduct system unless he submitted it through the investigation; and informed him that the Title IX Equity Compliance Office would answer any questions he had about the process. (Id.).

Plaintiff claims that he "was investigated, referred and ultimately disciplined for having engaged in unconsented touching, not sexual violence." (PageID 665).   Plaintiff ignores that he had notice of an investigation concerning "incidents which may involve sexual discrimination, including sexual harassment and sexual violence."   The University Student Handbook advises: "Sexual harassment includes but is not limited to nonconsensual sexual contact…." (PageID 142). Later the Student Handbook states, "Sexual violence could include, but is not limited to:

10

non-consensual sexual contact…." (PageID 143). Plaintiff cannot prevail on his breach of contract claim that he was not notified that he was being investigated for unconsented sexual touching.

Pierre further decries that the Handbook assures fairness and equal treatment of the accuser and the accused and that this was not afforded. According to Pierre, the Title IX investigators breached that obligation by failing to provide Pierre with the same opportunities to present his position and respond to Complainant's contentions as they provided to Complainant. Plaintiff points out the investigators provided Pierre's statement to Complainant during their June 4, 2015 interview, allegedly tainting the interview and giving Complainant an opportunity for rebuttal that was never afforded to Pierre. Additionally, Pierre alleges the University failed to conduct a thorough investigation in many regards. Multiple potential sources of evidence were not adequately examined or left entirely unexamined.

Pierre, however, was able to offer evidence and explain his version of the events. He was allowed to submit questions and have a lawyer present at the hearing. "Although the procedures employed…did not rise to the level of those provided to criminal defendants, that level of process is not required in school-disciplinary proceedings. *Doe v. Cummins*, 662 F. App'x 437, 451 (6th Cir. 2016) (citing *Flaim*, 418 F.3d at 635). At bottom, all that is required in a Title IX hearing is an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Pierre further contends that contractually, the University was obligated to conduct its investigation in a "prompt, thorough and impartial manner." (PageID 152). The University Handbook "Equity Complaint Process" section states that:

11

> The investigation and resolution shall be completed as promptly as possible and in most cases within 60 working days of the date the complaint was received, unless extenuating circumstances interfere with such timely completion. Typically, the formal investigation phase will be completed within 30 days and the disposition/resolution/appeal phase will be completed within 30 days of the completion of the investigation.  In the event that an investigation and resolution cannot be completed within 60 working days, the parties shall be notified in writing.

PageID 215.

The proper focus in analyzing whether a private university provided fundamental fairness is whether the University adhered to its misconduct procedure. *Doe v. Amherst College*, 3:15-cv-30097, Doc. 38 at 23 (D. Mass. Oct. 5, 2015).   The question is whether the proceedings fell within the range of reasonable expectations of one reading the relevant rules, an objective reasonableness standard. Id. at 19 (citing *Walker v. President & Fellows of Harvard Coll.*, 82 F. Supp. 3d 524, 530 (D. Mass. 2014).   "[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." Id. (quoting *Shauer v. Brandeis University*, 432 Mass. 474, 482 (2000).

Viewing the record of the University proceedings attached to Plaintiff's Complaint, the University did comply with its own policies.   Pierre also decries that the process took more than the 60 days exhorted in the Handbook.   The language of the Handbook is clearly an exhortation and the University Hearing Board's pace was laudable in light of the fact that the process occurred during the summer session.   Vague, hortatory pronouncements in a contract are insufficient to support a breach of conract claim. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1212 (9th Cir. 1999), opinion amended on denial of reh'g, 203 F.3d 1175 (9th Cir. 2000)(citing *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1320 (9th Cir. 1996)).

The provision in which Plaintiff seeks a promise is couched in so many qualifiers that it cannot be said that the amount of time taken to resolve this case was a contractual violation. While Plaintiff also points to the provision for written notice if the investigation is not completed within 60 days, the University's ongoing correspondence with Plaintiff fulfills this requirement. In this case, the entire process lasted over 120 days.   There is no allegation of facts that would allow one to conclude that this was not "as prompt as possible."

Pierre also alleges that he was never afforded an opportunity to respond to the new allegations or the shifting stories provided by the Complainant.  Again, all that is required is an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Doe v. Cummins*, 662 F. App'x 437, 451 (6th Cir. 2016) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). All that was ever required of him was an explaination of what caused him to believe he had consent.

As for Pierre's claims that the University failed to provide a fair hearing board, the University is only obligated to provide UHB members who are free of any "possible conflict of interest or bias." (PageID 129).   Pierre has not alleged any facts that would support the existence of any conflict of interest or bias on the part of the UHB.

Pierre also argues that the University is contractually obligated, as set forth in the Handbook, to "ensure that respondents are offered appropriate support and are treated fairly in the University's processes." (PageID 154).   Pierre claims the University refused to accommodate Pierre's learning disability by somehow penalizing him for providing a written statement in lieu of an interview, prohibiting him from proceeding in a meaningful way with a competent advisor and improperly placing the burden of proof on Pierre to prove his innocence.

Pierre received a copy of the Complainant's May 3, 2015 complaint on May 4. (PageID 274-76). Accompanying correspondence informed him that, should he opt to participate by written statement in lieu of an interview with the investigator, it would limit the ability of the University to discover facts that could support his version of key events. (Pl. Ex. 7). He responded to a May 11 request for an interview on May 18 by noting he would meet his attorney on May 14 and "soon after I will be able to tell you when we will be able to do the interview." (Pl. Ex. 32). On May 18, he notified the University that he had been advised to submit a written statement, which he would submit by May 28. (Id.; Pl. Ex. 33). The University investigated by interviewing the Complainant and various witnesses, obtaining a written statement from Pierre and obtaining various documents. (PageID 349). On June 18, the investigators gave Pierre the opportunity to submit any additional information to them. (Id. at ¶ 14).

Pierre received the full Title IX investigation report on July 1. (PageID 371). On August 13, he received the names of the hearing panel members, so he could raise any potential conflict or bias issues. (PageID 156). At the August 20 hearing, Pierre had the opportunity to submit questions to be asked of the Complainant and three witnesses present for the hearing–one of which was his roommate. (Id. at ¶¶ 9-12). Pierre did not submit questions for the Complainant or any witness. (Id.). At his Accountability Hearing, Pierre read a ten-page statement where he was able to point out every issue that he desired to the UHB. (Id.). Pierre's support person, an attorney, was present during the entire hearing. (Id. at ¶ 6).

Pierre further asserts that the University abused its discretion by acting arbitrarily in interpreting the contract. Pierre claims a sequence of unfair and unreasonable conduct throughout the investigation and disciplinary process. It is true that the Court is obligated to view the Complaint in a light most favorable to Pierre, see *Lutz*, 717 F.3d at 464 (the Court must "construe

the complaint in a light most favorable to plaintiffs, accept all plausible well-pled factual allegations as true and draw all reasonable inferences in plaintiffs' favor.").  However, it is also well established that school-disciplinary committees are entitled to a presumption of impartiality, absent an allegation of actual bias. *Doe v. Cummins*, 662 F. App'x 437, 449-50 (6th Cir. 2016) (citing *Atria v. Vanderbilt Univ.*, 142 Fed. App'x 246, 256 (6th Cir. 2005) ("[I]n a 'university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias.'" (quoting *McMillan v. Hunt*, No. 91–3843, 1992 WL 168827, at *2 (6th Cir. July 21, 1992)))).  Thus, "'[a]ny alleged prejudice on the part of the [decisionmaker] must be evident from the record and cannot be based in speculation or inference.'" *Doe v. Cummins*, 662 F. App'x 437, 450 (6th Cir. 2016) (quoting *Nash*, 812 F.2d at 665).  Pierre has not alleged any arbitrary actions by the University in its interpretation of the contract.

"It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975).  "A university is not a court of law, and it is neither practical nor desirable it be one." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 n.1 (6th Cir. 2005) (citation omitted).  "Before expelling a student for disciplinary reasons, a public institution must provide: 1) notice of the charges against the student; 2) an explanation of the evidence that authorities have against the student; and 3) an opportunity for the student to present his side of the story." *Ashiegbu v. Williams*, 129 F.3d 1263, 1997 WL 720477, at *1 (6th Cir. Nov. 12, 1997) (citing *Goss v. Lopez*, 419 U.S. 565, 581 (1975); *Newsome v. Batavia Local School Dist.*, 842 F.2d 920, 927 (6th Cir. 1988)).  "Further, a student faced with expulsion has the right to a pre-expulsion hearing before an impartial trier of fact." Id. (citing *Newsome*, 842 F.2d at 927).

Pierre's allegation that he shouldered the burden of proof in his disciplinary hearing is incorrect and otherwise insufficient to state a claim.   The University's use of the preponderance of the evidence standard of proof is directed by the Department of Education and its Office for Civil Rights. See *Russlynn Ali, Dear Colleague Letter*, U.S. Dept. of Educ. at 11 (Apr. 4, 2011), available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.   The University's Code of Conduct follows that directive. (PageID 154).

Pierre's assertion that this means he has to prove his innocence is incorrect.   Under the University's policy, respondents have the right to not participate in disciplinary hearings. (Id. at PageID 150).   If a complaining student made accusations against another student, the UHB could choose to disbelieve the complaining student even if the respondent failed to offer any evidence or testimony. See *Doe v. Univ. of Mass.-Amherst*, No. CV 14-30143-MGM, 2015 WL 4306521, at *7 (D. Mass. July 14, 2015) (discussing potential impact of OCR's directive to use a preponderance of the evidence standard).

Neither does Pierre have a right to be actively represented by counsel in a disciplinary proceeding.   "Ordinarily, colleges and universities need not allow active representation by legal counsel or some other sort of campus advocate." *Flaim*, 418 F.3d at 636.   "[A] right to counsel may exist if 'an attorney presented the University's case, or [ ] the hearing [was] subject to complex rules of evidence or procedure.'" *Id.* at 640 (citing *Jaksa v. Regents of Univ. of Mich.,* 597 F. Supp. 1245, 1252 (D. Mich. 1984); see also *Carter v. Citadel Bd. of Visitors*, 835 F. Supp. 2d 100, 103 (D.S.C. 2011) ("A student subject to dismissal on disciplinary grounds is not per se entitled to the presence of an attorney.") (citation omitted).

Pierre does not allege the Complainant was permitted to be represented by counsel in a manner differently than Pierre, and the University's rules of evidence and procedure in the

disciplinary process are not complex.   The University does not prohibit students from having an attorney present at a disciplinary hearing as an advisor.   The fact that the University does not allow an attorney to actively participate is not "fundamentally unfair."

It is not a due process violation to prohibit students from directly cross-examining each other, witnesses, or University employees.   "Students do have a right to have the evidence against them explained and to be given an opportunity to rebut that evidence, but this right does not entitle them to know the identity of student witnesses, or to cross-examine students or school administrators." *C.Y. ex rel. Antone v. Lakeview Pub. Sch.*, 557 F. App'x 426, 431 (6th Cir. 2014). The parties in University disciplinary hearings are not permitted to directly cross-examine one another.   However, the parties may cross-examine one another by submitting questions to the UHB and requesting that those questions be asked to the opposing party.   The University's form of cross-examination is consistent with due process. See *E.K. v. Stamford Bd. of Educ.*, 557 F. Supp. 2d 272, 277 (D. Conn. 2008) ("[A] provision that disallowed admission of hearsay statements and required confrontation of student witnesses or disclosure of witness identities would be overly burdensome to schools due to the increasing challenge of maintaining order and discipline.") (citation omitted).   Pierre did not even attempt to ask any questions of the Complainant or any other witness.

The contract does not require that Pierre be afforded the opportunity to engage in discovery.   Pierre makes various discovery-related complaints, asserting that he could not adequately prepare for the hearing.   "A student is not entitled to 'discovery' as if he were a litigant in a civil or criminal proceeding." *Johnson v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, 2013 WL 5298484, at *12 (E.D. Pa. Sept. 19, 2013).

According to Pierre's Complaint and related documents, Pierre was afforded due process throughout his disciplinary matter.   Pierre was made aware of the allegations against him on May 4. (PageID 227).   The matter was investigated by interviewing the Complainant and various witnesses and obtaining a written statement from Pierre. (PageID 349-50).   The investigators also obtained various documents as part of their investigation. (Id.).   On June 18, Pierre was given the opportunity to submit any additional information to the Title IX investigators. (PageID 350-51). The full Title IX investigation report was made available to Pierre on July 1. (PageID 348).   Pierre knew the relevant parties, the statements that those parties had given and all the evidence that would be presented at his Accountability Hearing nearly two months in advance.   At the hearing, Pierre was given the opportunity to submit questions to be asked of the Complainant and three witnesses present for the hearing – one of which was his roommate. (Id.).   Pierre did not submit questions for any party. (Id.).

Similar to *Valente v. Univ. of Dayton*, Pierre "got exactly what he contracted for by way of discipline: . . . process with myriad due process protections, more confidentiality than any criminal defendant gets, and eventual judgment by" a panel of students and University staff. 689 F. Supp. 2d 910, 923 (S.D. Ohio 2010).   Pierre has failed to state a breach of contract claim upon which relief can be granted.

### Count II — Negligence in Discipline

The University also seeks dismissal of Pierre's asserted claim of negligence in discipline. In previously ruling on a negligence in discipline claim, *Valente v. Univ. of Dayton*, this Court held that "[n]one of the[] actors had any duty to Plaintiff which was allegedly breached except for duties imposed on them by their roles in carrying out the contractual relationship between the parties." 689 F. Supp. 2d at 924.   This Court concluded "that Ohio courts would not recognize

18

causes of action for negligence against the University of Dayton for the asserted negligence of its agents in performing their parts in the contractual relationship with Plaintiff." Id. As alleged by Pierre, every individual involved in Pierre's disciplinary matter on behalf of the University was performing his or her assigned role in the University's disciplinary process. Pierre is trying to use a negligence claim as another means to assert his other contract claims. (PageID 73).

Pierre's negligence claim is essentially one for educational malpractice. A claim for negligence in the university-student context is not cognizable under Ohio law because Ohio courts have recognized that such a claim "is essentially one of educational malpractice" which is not recognized in Ohio. See *Lemmon v. Univ. of Cincinnati*, 750 N.E.2d 668, 672 (Ohio Ct. Cl. 2001) (citing *Malone v. Academy of Court Reporting*, 582 N.E.2d 54, 58 (Ohio App. 1990)). Pierre fails to state a negligence claim upon which relief can be granted

**Counts III and IV — Failure to Accommodate in Violation of the Rehabilitation Act and the Americans with Disabilities Act**

Next, the University seeks dismissal of Pierre's Americans with Disabilities Act and Rehabilitation Act claims for failure to accommodate. "Institutions [of postsecondary education] do not have a duty to identify students with disabilities. Students in institutions of postsecondary education are responsible for notifying institution staff of their disability should they need academic adjustments." *U.S. Dept. of Education Office for Civil Rights, Transition of Students With Disabilities To Postsecondary Education: A Guide for High School Educators*, http://www2.ed.gov/about/offices/list/ocr/transitionguide.html#note16.

In addition to the law requiring Pierre to request an accommodation before any University obligation is triggered, Pierre was notified of his responsibility when he began at the University. (PageID 346-47); see also *Blower v. Univ. of Washington*, No. C10-1506MJP, 2010 WL 3894096,

at *2 (W.D. Wash. Sept. 27, 2010) ("[T]he weight of the authority places the burden on her to request an accommodation before any duty is triggered.") (citing cases); and *Buescher v. Baldwin Wallace Univ.*, 86 F. Supp. 3d 789, 806 (N.D. Ohio 2015) ("[S]he did not request an accommodation for her disability and there can be no failure to accommodate.").   Pierre has failed to state a claim for failure to accommodate because he did not mention a need for any accommodation until after his disciplinary hearing.

That the University's Office of Learning Resources department knew that Pierre had a disability does not trigger an obligation on every department of the University to offer him accommodations when dealing with him. See *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 465 (4th Cir. 2012) (affirming dismissal of a former student's ADA claim where he had only previously requested testing accommodations from the university and did not make any other accommodation request until he submitted a letter appealing his dismissal from the university). Other departments in the University would not know to ask Pierre about accommodations because University policy dictates that Pierre's disability and accommodations are confidential.

Pierre first alleged that because he has a disability, he does not have the ability to articulate and express himself verbally while under stress and pressure and the University should have allowed him "meaningful representation," nearly four months after he was first notified of the disciplinary process. (PageID 389-92).   "The majority of federal courts agree that an after-the-fact accommodation request is not timely." *Shaikh v. Lincoln Mem'l Univ.*, 46 F. Supp. 3d 775, 786 (E.D. Tenn. 2014).

The University allowed Pierre to have legal representation accompany him throughout the process. (PageID 214).   Pierre chose to submit a written statement instead of being interviewed. (PageID 349).   He declined to submit questions during his hearing, despite the fact that his

attorney could have written the questions for him. (PageID 373).   Pierre  was permitted to distribute and read a ten-page written statement at his hearing. (PageID 374).   Even if Pierre had requested an accommodation, the University accommodated his inability to articulate and express himself throughout the process.

**Count V – Title IX Erroneous Outcome Claim**

The University next seeks dismissal of Pierre's Title IX erroneous outcome claim.   Title IX prohibits the University from discriminating "on the basis of sex." 20 U.S.C. § 1681(a). "Under the 'erroneous outcome' or 'selective enforcement' standards, a plaintiff must demonstrate that the conduct of the university in question was motivated by a sexual bias." *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009) (citing *Mallory v. Ohio Univ*., 76 F. App'x. 634, 638 (6th Cir. 2003)).   Mere "[a]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).   Pierre describes what he believes to be a "flawed proceeding" and asks the Court to accept that it must have been caused by gender animus.   He alleges nothing which would establish a causal connection between an allegedly "flawed proceeding" and gender animus.

"Allegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases." *Yusuf*, 35 F.3d at 715 (2nd Cir. 1994). "Such allegations might include…statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id*.   The Complaint includes no allegations of comments from any University official relating to a gender bias.   The Complaint includes no allegation that the

University has engaged in a pattern of decision-making that shows any influence of gender on his disciplinary proceeding. See *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 211-12 (W.D.N.Y. 2013) (noting there were no allegations of "facts suggesting that the University ever received a complaint against a female student comparable to that filed against [the plaintiff], and treated the female student more favorably").

A Title VII plaintiff must plead either direct evidence of discrimination (i.e., gender-biased comments or animus) or a *McDonnel/Douglas prima facie* case (e.g., replaced by a person of a different gender or a similarly situated person of a different gender was treated better). See *Sahm v. Miami Univ*., No. 1:14-cv-698, 2015 WL 2406065, at* 4 (S.D. Ohio May 20, 2015) (dismissing expelled student's complaint because it was void of allegations of causation sufficient to state a Title IX claim and noting that there were no allegations similar to those sufficient to state a Title VII claim).

That Pierre is a male who was accused of sexual assault, standing alone, is not sufficient to support an assertion that his gender played a role in finding him responsible for sexual assault no more than a member of a suspect class in the employment context may assert that an actionable employment decision was taken against them simply because of their inclusion in the suspect class. See *King v. DePauw Univ*., No. 2:14-CV-70-WTLDKL, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014).  The University has no control over the gender of a student who accuses another student of sexual misconduct, nor over the gender of the student so accused.

Pierre has offered no allegations of direct or circumstantial evidence indicating that his gender played any role in this situation.   Without allegations of gender bias, Pierre's challenge of the outcome of his disciplinary hearing under Title IX fails. *See Hall v. Lee Coll., Inc.*, 932 F. Supp. 1027, 1033 (E.D. Tenn. 1996) (dismissing the plaintiff's Title IX claim against the

defendant college where the plaintiff offered no direct or circumstantial evidence that her suspension was as a result of her gender).   Pierre has failed to state a Title IX erroneous outcome claim upon which relief can be granted and this claim will be dismissed.

### Count VI — Deliberate Indifference Theory

The University next seeks dismissal of Pierre's Title IX deliberate indifference claim. "The 'deliberate indifference' standard is applied where a plaintiff seeks to hold an institution liable for sexual harassment and requires the plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Mallory*, 76 F. App'x at 638 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998).   "The 'deliberate indifference' must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Doe v. Univ. of the South*, 687 F. Supp. 2d at 757 (citing *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009)).   While sexual violence is a form of sexual harassment under Title IX, Pierre does not allege that he was a victim of sexual violence or was otherwise harassed.   Assuming the Sixth Circuit would recognize a deliberate indifference claim,[1] Pierre has not stated a claim under a deliberate indifference theory.

### Counts VII and VIII — Ohio Arbitration Act

Finally, the University seeks to dismiss Pierre's claims under the Ohio Arbitration Act.

---

1 *Mallory* assumed without deciding that a deliberate indifference standard applied and affirmed a grant of summary judgment for the university where there was no genuine dispute of material fact whether the university's actions were motivated by the disciplined student's gender. 76 F. App'x at 638.
.

The Ohio Arbitration Act only applies if there is "[a] provision in any written contract . . . to settle by arbitration a controversy that subsequently arises out of the contract . . . ." Ohio Rev. Code § 2711.01.  In this case, there is no written contract between Pierre and the University to settle controversies between them through arbitration.  Pierre has not asserted that any such contract exists.   Pierre has not stated a claim under the Ohio Arbitration Act.

For these reasons, Defendant University of Dayton's Motion to Dismiss Plaintiff Dyshawn Pierre's Complaint for Failure to State a Claim, Doc. 13, is **GRANTED**.   The Clerk is **ORDERED** to **TERMINATE**  the instant action from the dockets of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, March 27, 2017.


s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE